# Wilson, Appellant, *v.* Hess.

*Liquor law—Selling to man of intemperate habits—Civil liability—Proximate cause.*

In an action instituted by a widow against a licensed saloon-keeper, to recover damages for selling liquor to the plaintiff's husband, it appeared that the latter's death had resulted from a fall while walking along an unobstructed sidewalk after a three days' drinking debauch. It also was established that for about a week preceding his death, plaintiff's husband had not been working, and that during that time he was drinking heavily; that he had deposited money with the defendant, who sold drinks to him at various times for a period of three days, and that he was visibly under the influence of liquor when he left the saloon.

*Held:* that it was for the jury to determine whether or not the deceased's death was due to the negligent and unlawful conduct on the part of the defendant, in furnishing him with intoxicating liquors.

Argued October 20, 1921. Appeal, No. 150, Oct. T., 1921, by plaintiff, from judgment of C. P. No. 1, Phila. Co., June T., 1920, No. 501, on verdict for defendant non obstante veredicto in the case of Isabella Wilson v. Charles Hess. Before ORLADY, P. J., PORTER, HENDERSON, HEAD, TREXLER, KELLER and LINN, JJ. Reversed.

Trespass to recover damages for death of plaintiff's husband. Before SHOEMAKER, J.

The facts are stated in the opinion of the Superior Court.

Verdict for plaintiff for $1,000. Subsequently, on the motion, the court entered judgment in favor of the defendant non obstante veredicto. Plaintiff appealed.

*Error assigned* was the judgment of the court.

*David Lavis,* for appellant.

*Harry Felix,* of *Illoway and Felix,* for appellee.

OPINION BY ORLADY, P. J., November 21, 1921:

The plaintiff instituted this action against the defendant to recover damages for the death of her husband by reason of the unlawful conduct and negligence of the defendant. The facts are not in material dispute. On April 21, 1920, about seven o'clock in the evening the plaintiff's husband while on the pavement of Toronto Street suddenly fell backward and was picked up by friends, taken to a hospital in a patrol wagon and died the following day from causes described by a coroner's jury and attending physicians of the hospital, as a fracture of the base of the skull with concussion of the brain. There is no challenge to the fact that the immediate cause of death was the fracture of the skull with the resultant concussion of the brain, induced by the fall on the pavement. We are more directly concerned as to the proximate cause of this fall. The evidence shows that the deceased was about sixty years of age. He had been continuously at work for twenty-one months without losing a day, at wages ranging from thirty to thirty-five dollars per week, of which he gave his wife ten to fifteen dollars a week. For about a week preceding his death he was not working on account of having sore eyes and during that time he was drinking heavily. The defendant was a licensed saloonkeeper and well acquainted with the deceased as he was frequently in his place of business at Twenty-first and Toronto streets, Philadelphia. The record of the three days immediately prior to the death of plaintiff's husband is important and is given by a number of witnesses. On Monday, the nineteenth, at 8 o'clock in the morning, the deceased requested the defendant's barkeeper to cash a fifty dol-

lar liberty bond for him and after being refused he left the saloon to soon thereafter return with forty dollars in cash which he gave to Hess, the proprietor of the saloon, this defendant, to hold for him. Hess then sold him two drinks and stated to the barkeeper "give him anything he wants, he has a money account here." In the afternoon the deceased returned and Hess gave him another drink and from several witnesses it is clearly established that he had ten to fifteen drinks on that day at the saloon. On Tuesday he came in eight o'clock in the morning and got a drink from the bartender and was then visibly affected by intoxicating drinks. As one witness stated it, you could recognize the man was drunk by his actions. He came back in the afternoon and was quite drunk and got two more drinks. Hess suggested that he come back a little later, an hour or so when he could have more. He returned at the end of two hours and had two more drinks. He received ten drinks on Tuesday at this saloon. He had been drunk every day as a witness described it "staggering around and could not talk." The police took him up several times to his home. On Wednesday at eight o'clock in the morning he received two drinks from the bartender, at half past nine two more drinks, at half past ten, Hess, being in charge of the saloon said: "Robert, you look bad. I will give you one more." That made six. At half past four in the afternoon the bartender gave him another. At five o'clock he was staggering drunk in the saloon and in a heated argument with a man there, could not control himself. At half past six he was quite drunk and the bartender in giving him a drink stated, "drink this up right away and come back when Hess comes in." He had at least twelve drinks on Wednesday. A little after seven o'clock he came out of the side door of the saloon on Toronto Street quite drunk, "in a staggering condition, walking very slow and while on an unobstructed pavement at about the middle of the block he stood for a moment and all at once fell right back on his head."

A crowd gathered and he was raised to a sitting posture and his condition was described by several witnesses as, "being unconscious, he could not be wakened up by shaking, he was snoring very hard; he smelled awful of drink; blood was freely flowing out of his left ear." He was assisted to an ambulance and taken to the hospital and, as before stated, died the following day, without recovering consciousness. The drinks he received in Hess's saloon were called ginger brandy and served from a brown unlabeled 5 by 8 bottle, over the bar. Those who were accustomed to its use and familiar with this drink and defined by several witnesses who drank of it with Wilson and from the same bottle, described it as "ginger brandy, is what we called it and we got whiskey, it was whiskey." Along with this on several occasions he drank beer or near beer. Another item closely bearing on his relations to the defendant, is the fact that on Monday the 19th, the deceased requested the defendant to cash a fifty-dollar liberty bond, and when refused he pawned the bond, and gave Hess forty dollars for safekeeping. From this fund the defendant testifies he gave the deceased ten dollars in the afternoon of Monday, one dollar in the forenoon, and fifteen dollars in the afternoon of Tuesday, fourteen dollars in the morning of Wednesday the 21st. As he saw him several times each day, knowing his condition, and daily giving him money, which he saw was being used at his saloon would naturally have much weight with the jury in determining his knowledge of the nature and effect of the bottle labelled "ginger cordial." Especially so, as it was not shown at the trial that the deceased received any drinks at any other place. The defendant urges that there was no evidence showing that Wilson received any drink containing "a greater alcoholic content than one-half of one per cent of alcohol" and that the landlord defendant was authorized by law to make sales of this product. The name given to the drink is not controlling. No analysis of it was made to show its alcoholic contents,

but there was abundant evidence to warrant the jury in finding that it was a highly intoxicating drink and while called by the customers of the saloon "ginger brandy" they knew what they wanted and received and expected was an article commonly called "whiskey" which produced drunkenness and helplessness and was served over the bar and further that the deceased was for three successive days in a staggering drunken condition to such a degree, that while on an unobstructed pavement he fell to the ground unconscious.  We are concerned more about the actual and direct results of these sales than the refinements of the laboratory as to the name of the article or its percentage of alcohol.  The issue was, did this defendant, by reason of his unlawful conduct and negligence in selling this drink to a man who was in a visibly intoxicated condition, which was exhibited to the landlord many times for three days in succession, produce such a condition of helplessness, as reasonably to be the cause of the result which followed, as to make it the proximate cause of his death.  The contention that the voluntary taking of liquor while intoxicated and being at the time of known intemperate habits was such contributory negligence on his part as would prevent a recovery by the plaintiff, will not bear examination. Such a ruling would practically destroy the act of assembly.  Every drunkard not only takes liquor voluntarily but whenever he can get it and because of his weakness the law makes the saloonkeeper responsible for selling to such persons.  The drunkard has not the will to resist temptation and for this reason the sale to him is forbidden: Davis v. McKnight, 146 Pa. 610; Littell v. Young, 5 Pa. Superior Ct. 205; Bier v. Myers, 61 Pa. Superior Ct. 158.  The question, what was the proximate cause of his death was for the jury and it has been decided against the defendant by abundant evidence under the facts developed on the trial.  It was surely not required of the plaintiff that she should show that her husband would not have met his death as he did had

the defendant not sold him the liquor: McHugh v. Schlosser, 159 Pa. 480. Was there such a succession of facts and circumstances so linked together as to produce an expected result? The jury has decided this question with ample evidence: Temme, Appellant, v. Schmidt, 210 Pa. 507. The reason given in the order of the court below as follows: "There is absence of evidence to show that any act of defendant was the proximate cause of the death of the plaintiff's husband and the motion for judgment non obstante veredicto is therefore granted and judgment entered for defendant, with an exception to plaintiff," is not warranted under the testimony and we cannot concur in this conclusion. There was abundant evidence to warrant the finding of the jury and the conclusion, to our mind, is irresistible, that with the continuing sale of this liquor, be it called ginger brandy or whiskey by the defendant, with full knowledge of his condition which was becoming more pronounced each day and furnishing him money to make further purchases, was such negligence and unlawful conduct on the part of the defendant as to warrant the recovery in this case.

The order of the court below is reversed. The verdict is reinstated and judgment is directed to be entered thereon.